UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANICA BULOVIC,

               Plaintiff,

    -v-

BRUCE W. BOTH, U.F.C.W. LOCAL 1500
PENSION FUND PLAN MANAGER AND
TRUSTEE, and U.F.C.W. LOCAL 1500 PENSION
PLAN,

             Defendants.

Case No. 12-CV-4758 (KMK)

OPINION AND ORDER

Appearances:

Danica Bulovic
Mamaroneck, NY
*Pro Se Plaintiff*

Michael Howard Isaac, Esq.
Broach & Stulberg, LLP
New York, NY
*Counsel for Defendant*s

KENNETH M. KARAS, District Judge:

      Pro se Plaintiff Danica Bulovic ("Bulovic") brings this Action against Defendants Bruce

W. Both ("Both"), in his capacity as Plan Manager and Trustee of the United Food and

Commercial Workers International Union Local 1500 ("Local 1500") Pension Fund ("the

Fund"), and the Fund's employee pension benefit plan ("the Plan") (collectively "Defendants").

Among other claims, Plaintiff asserts that Defendants improperly denied her application for a

pension.  Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of

Civil Procedure.  For the following reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

#### 1.  The Fund's Employee Pension Benefit Plan

The Fund maintains an employee pension benefit plan within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(2).  (*See* Defs.' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1 Statement") ¶ 1.)[1] Through this Plan, the Fund provides benefits to certain employees whose employers contribute to the Fund on their employees' behalf pursuant to collective bargaining agreements ("CBAs") with Local 1500.  (*See id.*)  The Fund was established and is maintained pursuant to an Agreement and Declaration of Trust, which came into effect on May 21, 1956, was amended on May 26, 1967, and was restated on November 28, 1975.  (*See id.*; Def. Both's Aff. in Supp. of Defs.' Mot. for Summ. J. ("Both's Aff."), Ex. A.)  A Board of Trustees ("the Board"), composed of an equal number of employer and employee representatives, administers the Fund.  (*See* Defs.' 56.1 Statement ¶ 1.)[2]  The Board is the "plan sponsor" and "plan administrator" of the

_____

[1] ERISA defines "employee pension benefit plan" in the following manner:

"[T]he terms 'employee pension benefit plan' and 'pension plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan."

29 U.S.C. § 1002(2).

[2] As Defendants note, the equal representation of employers and employees on the Board is mandated by Section 302(c)(5) of the Labor Management Relations Act of 1947, which excepts from that Section's restrictions on financial transactions "money or other thing of value

2

Plan, within the meaning of those terms as ERISA defines them.  (*See id.*)[3]  The Plan's terms are set forth in a Plan document, which the Board amends as needed.  (*See id.* ¶ 2.)  The Fund also publishes explanatory summary plan descriptions ("SPDs"), which it distributes to Plan participants in accordance with ERISA.[4]  (*See id.*)  Between 1987 and 2011, the Fund published SPDs on January 1, 1987; October 1, 1993; January 1, 1995; January 1, 2001; January 1, 2003; January 1, 2008; and January 1, 2011.  (*See id.*)

### 2.  Plaintiff's Employment and Termination

Plaintiff began working for First National Supermarkets ("First National") on May 1, 1989.  (*See* Pl.'s Statement of Material Facts Pursuant to Local Rule 56.1 ("Pl.'s 56.1 Statement"); Defs.' 56.1 Statement ¶ 3.)[5]  As of that date, Plaintiff was approximately 52 years

---

paid to a trust fund established . . . for the sole and exclusive benefit of the employees of [an] employer . . . : *Provided*, That . . . the detailed basis on which such payments are to be made is specified in a written agreement with the employer, *and employees and employers are equally represented in the administration of such fund* . . . ."  29 U.S.C. § 186(c)(5) (emphasis added).

[3] *See* 29 U.S.C. § 1002(16)(B) ("The term 'plan sponsor' means . . . [,] in the case of a plan established or maintained by two or more employers *or jointly by one or more employers and one or more employee organizations*, the association, committee, *joint board of trustees*, or other similar group of representatives of the parties who establish or maintain the plan." (emphasis added)); *id.* § 1002(16)(A) ("The term 'administrator' means . . . [,] if an administrator is not . . . designated [by the terms of the instrument under which the plan is operated], the plan sponsor . . . .").

[4] *See* 29 U.S.C. § 1024(b) (detailing the manner in which "[p]ublication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan").

[5] Defendants characterize Plaintiff as "a former employee of Edwards Super Food ('Edwards')," which "was operated by First National Supermarkets, which was owned by Stop [&] Shop . . . ."  (Defs.' 56.1 Statement ¶ 3.)  However, Plaintiff states that "First National Supermarket [was her] employer, not Edwards[,] as Defendant[s] wrote in [s]upport of their [M]otion."  (Pl.'s 56.1 Statement.)  Because Defendants acknowledge that the employment in question counted towards Plaintiff's Pension Service under the Plan, (*see* Defs.' 56.1 Statement ¶ 3), choosing between Edwards and First National in describing Plaintiff's employer has no

old.  (*See* Defs.' 56.1 Statement ¶ 3 ("The year of [Plaintiff's] birth is 1937.").)  Plaintiff worked

for First National until January 1997, at which point First National terminated Plaintiff's

employment for cause.  (*See id.*; Pl.'s 56.1 Statement ¶ 3; Pl.'s Aff. in Opp. to Defs.' Mot. for

Summ. J. ("Pl.'s Aff.") ¶ 5.)[6]  Plaintiff claims that the date on which she was terminated was "20

days before [her] 60th birthday."  (Pl.'s 56.1 Statement ¶ 3.)  The total amount of time that

Plaintiff worked for First National before being terminated was thus approximately seven years

and nine months.  (*See* Defs.' 56.1 Statement ¶ 3.)  After First National terminated her, Plaintiff

worked for an entity that Defendants describe as "Temp Force" in 1997; Waldbaum's in 1998;

and The Great Atlantic & Pacific Tea Company ("A&P") in 1999.  (Defs.' 56.1 Statement ¶ 4;

---

bearing on the Court's resolution of Defendants' Motion.  As a result, the Court will follow
Plaintiff's preference, and refer to Plaintiff's employer as of May 1, 1989 as First National.

[6] Defendants and Plaintiff also disagree as to Plaintiff's status during her employment as
a part- or full-time employee, as well as to which entity Plaintiff was working for at the time she
was terminated.  Defendants state that Plaintiff began working for Edwards part-time in May
1989, became a full-time Edwards employee in August 1995, and was terminated by Edwards in
January 1997.  (Defs.' 56.1 Statement ¶ 3.)  In support of this claim, Defendants have provided
certain employment records.  (*See* Def. Both's Aff. in Supp. of Defs.' Mot. for Summ. J.
("Both's Aff.") Exs. B, C.)  But Plaintiff claims that when she began working for First National
in May 1989, she was a "full time employee."  (Pl.'s 56.1 Statement.)  She also claims that,
"[a]fter 8 years of full time employment with First National," her "new [e]mployer (for 14
week[s]) Stop & Shop, fired [her]," (Pl.'s 56.1 Statement ¶ 3), while also stating that she
"worked full time but . . . was paid [a] part-time rate, except in 1996 before [her] job was
terminat[ed]," (*id.* ¶ 8).  In relation to her statement that it was Stop & Shop that ultimately
terminated her, she states that, "[o]n 11/15/1[9]97[,] [she] received from Stop & Shop [a] check
in the amount of [$1,245.13]."  (*Id.* ¶ 7.)  She further alleges that "[t]he Statement of
Defendant[s] that [she] did not work for First National Supermarket and Stop & Shop is
absolutely false," as she "worked full time and paid [union] due[s] . . . weekly."  (Pl.'s Aff.
¶ 10.)  However, once again, because Defendants acknowledge that the employment in question
counted towards Plaintiff's Pension Service under the Plan, (*see* Defs.' 56.1 Statement ¶ 3),
describing Plaintiff as a part- or full-time employee, and describing the entity that ultimately
terminated her as First National, Edwards, or Stop & Shop, does not impact the Court's analysis.
As the Court has already followed Plaintiff's preference in describing the entity for which she
began working in May 1989 as First National, for the sake of simplicity, the Court will refer to
the entity that terminated her as the same.

Pl.'s Aff. ¶¶ 11-13.)  A&P acquired Waldbaum's in or about 1986.  (Defs.' 56.1 Statement ¶ 3.)

Plaintiff characterizes Waldbaum's as a "subsidiary" of A&P.  (Pl.'s Aff. ¶ 11.)

During Plaintiff's employment with First National, it "was owned by Stop [&] Shop, an

employer that has contributed and continues to contribute to the Fund on behalf of certain

classifications of employers pursuant to a series of collective bargaining agreements with [Local

1500]."  (Def's 56.1 Statement ¶ 3.)  However, according to Defendants, Temp Force was not a

contributing employer to the Fund.  (*Id.* ¶ 4.)  Defendants further state that A&P "never

contributed to the Fund on behalf of employees of Waldbaum[']s [either], but instead

contribute[d] to the [United Food and Commercial Workers International Union ("UFCW")]

Local 338 [("Local 338")] Pension Fund," which is a "separate legal entit[y]" from the Local

1500 Fund, with which the Local 1500 Fund did "not have a reciprocity agreement."  (*Id.*)

Additionally, Defendants state that "A&P also [did] not contribute to the Fund on behalf of

employees who work[ed] in the stores it operate[d] under its own name."  (*Id.*)  Nowhere in

Plaintiff's submissions does she provide any evidence that Temp Force, A&P, or Waldbaum's

contributed to the Fund.[7]

---

[7] In fact, Plaintiff attached a document to a letter that she submitted to the Court on
January 22, 2014, which document suggests that she acknowledges that neither Temp Force, nor
Waldbaum's, nor A&P contributed to the Fund.  (*See* Dkt. No. 25.)  The document lists
Plaintiff's "Years of Service with UFCW–Local Unions Plans," and lists the years 1989–97 as
her "UFCW–Local 1500 Years of Service," with 1997 listed as counting for one-twelfth of a
year.  (*Id.*)  However, the years 1998 and 1999, the years during which Plaintiff worked for
Waldbaum's and A&P, are not listed under "UFCW–Local 1500 Years of Service," but are
instead listed under "UFCW–Local 338."  (*Id.*)

3.   The Plan Terms in Effect at the Time of Plaintiff's Termination

The Parties appear to agree that the Plan terms that were in effect when Plaintiff was

terminated in January 1997 are set forth in the January 1, 1993 Restated Plan ("the 1993 Plan").[8]

The 1993 Plan states that it "applies to participants who retire, die, accrue benefits *or separate*

*from service after 1992*," and that "[t]he rights and benefits of every other Employee shall be

governed by the provisions of the Plan in effect at the Employee's retirement, death *or*

*separation from service*."  (Both's Aff., Ex. D ¶ 2 (emphasis added).)[9]  Therefore, because the

_____

[8] Defendants clearly state that "[t]he terms of the Plan that were in effect . . . when [Plaintiff] was terminated . . . are set forth in the January 1, 1993 Restated Plan . . . ."  (Defs.' 56.1 Statement ¶ 5.)  It is less clear which terms Plaintiff believes were in effect when she was terminated, but statements that she makes at various points throughout her submissions lead the Court to the conclusion that she substantially agrees with Defendants.  For example, Plaintiff states that she was "vested [i]n January 1995, according to . . . UFCW Local 1500 Pension Plan – Summary Plan Description, January 1, 1995. . . .  It [was the] SPD in effect when [she] was terminated."  (Pl.'s 56.1 Statement ¶ 1.)  The Fund issued the January 1, 1995 SPD that Plaintiff references to explain the 1993 Plan's terms.  (Defs.' 56.1 Statement ¶ 5.)

Plaintiff also states that the "Restated Plan 1/1/1993 [was] replaced with Pension Plan (SPD) October 1, 1993, effective date 1/1/1993," and that "pension restated plan to 1/1/1993 . . . ."  (Pl.'s 56.1 Statement ¶¶ 12–13; *see also* Pl.'s Aff. ¶ 2 ("The Restated Plan 1/1/1976 to 1/1/1993 is replaced by Pension Plan – SPD, published in October 1993, with effective date 1/1/1993.").)  The Court interprets these statements as reflecting Plaintiff's belief that the terms of the SPD that the Fund published on October 1, 1993 somehow replaced the terms of the January 1, 1993 Restated Plan.  This belief is legally erroneous, as SPDs merely explain, but cannot replace, the Plan terms to which they relate.  As the October 1, 1993 SPD states, "In the event there appears to be a conflict between the description of any plan provision in this booklet and its statement in the Plan Of Benefits, the language contained in the Plan Of Benefits . . . is the official and governing language."  (Pl.'s Aff.)  The January 1, 1995 SPD contains identical language.  (*See* Both's Aff., Ex. E, at D.)  Nevertheless, because the Fund issued the October 1, 1993 SPD to which Plaintiff refers to explain the January 1, 1993 Restated Plan, Plaintiff's reliance on that SPD is an implicit acknowledgment of the January 1, 1993 Restated Plan's applicability.  Further, as part of Plaintiff's Opposition to Defendants' Motion, she submitted copies of the October 1, 1993 SPD, as well as the January 1, 1993 Restated Plan itself, which also evidences her implicit agreement with Defendants as to which version of the Plan was in effect when she was terminated.  (*See* Dkt. No. 20.)

[9] As so much of the following analysis will be guided by the Plan's terms, the Court notes at the outset that it construes those terms "according to general principles of contract law,

1993 Plan was in effect at the time of Plaintiff's separation from service in January 1997, and

because the 1993 Plan states that the benefits of employees who separate from service after 1992

are to be determined by reference to the 1993 Plan, whether Plaintiff is entitled to the benefits

that she seeks is determined by reference to the terms of the 1993 Plan itself, as well as the SPD

that the Fund issued to explain those terms on January 1, 1995 ("the 1995 SPD").  (*See* Defs.'

56.1 Statement ¶ 5.)

The 1993 Plan explains the conditions that a Plan participant is required to meet "in order

to vest in his or her pension benefit"—in other words, "the conditions under which the

participant's benefit will become non-forfeitable," (*id.*):

> A participant shall be considered vested at the earliest date after 1975 on which the
> participant:
>
> A.  has satisfied the age and service requirements for an Early or Normal
> pension hereunder; or
>
> B.  attains Normal Pension Age; or
>
> C.  has at least ten years of Vesting Service (five years of Vesting Service if
> not represented by a collective bargaining representative and the date of
> determination is after 1988); or
>
> D.  has at least ten years of Pension Service including at least two years of
> Future Pension Service.

(Both's Aff., Ex. D., at 400, § 4.02.)  The 1995 SPD explains this provision as follows:

> After 1975, you will be 100% vested in your accrued pension benefit if you satisfy
> *any one* of the following three alternate requirements:
>
> •      you satisfy the age and service requirements for normal or early
>        pension; or

---

looking to the language of the Plan and other indicia of the intent of the Plan's creator."  *Austin
v. Ford*, No. 95-CV-3730, 1998 WL 88744, at *3 (S.D.N.Y. Mar. 2, 1998) (internal quotation
marks omitted) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112–13 (1989)).

- you have at least ten years of Pension Service; or

- you have at least ten years of Vesting Service.

Plan participants who are not covered by a bargaining agreement may satisfy the vesting requirement with five years of Vesting Service.

(Both's Aff., Ex. E, at 12, ¶ 28.)

The 1993 Plan also explains how a participant can acquire Pension or Vesting service, ten years of which vests a participant in her benefits. According to the Plan, "'Pension Service' means 'Past Pension Service' and 'Future Pension Service.'" (Both's Aff., Ex. D, at 103, § 1.13.) The Plan defines "Future Pension Service" as "employment by an Employee with an Employer in a position for which the Employer is required to contribute to the Fund in accordance with a collective bargaining agreement with the Union or an agreement between such Employer and the Trustees." (*Id.* at 103, § 1.13B.) The Plan's definition of "Past Pension Service" is irrelevant to Defendants' Motion.[10] As for "Vesting Service," the Plan provides that

---

[10] The Plan defines "Past Pension Service" as follows:

A. PAST PENSION SERVICE. "Past Pension Service" means employment by an Employee with an Employer before such Employer's Employer Participation Date provided such Employer Participation Date is before 1960 or such Employer is one which has been approved by the Trustees, as an Employer the employees of which can receive credit for Past Pension Service even though such Employer's Participation Date is after 1959, provided:

    1. such employment was Covered Employment;

    2. such employment was the type for which such Employer was required to contribute to the Fund on the Employer's Employer Participation Date; and

    3. such employment of the Employee was continuous with the same Employer to the date of the Employer's Employer Participation Date.

(Both's Aff., Ex. D, at 103, § 1.13A.)

it includes both "Pension Service," described above, as well as "Related Employment for employment after 1975 . . . ." (*Id.* at 105, § 1.21.)  The Plan defines "Related Employment" as "employment, after 1975, with a contributing Employer for which employment such Employer is not required by agreement with the Union or with the Trustees to contribute to the Fund, provided such employment is not separated from Covered Employment with the same Employer, by a quit, discharge, or retirement." (*Id.* at 104, § 1.17.)

As to the age and service requirements for an Early Pension, the Plan states that the Early Pension Date for a participant shall be the first day of the month coinciding with or next following the latest of the participant's 55th birthday; the participant's completion of at least 25 years of Pension Service (including at least two years of Future Pension Service); the date of the participant's proper application for pension to the Trustees; and the participant's cessation of work at employment that would earn Pension or Vesting Service under the Plan. (*Id.* at 500, § 5.02.)  In question-and-answer format, the 1995 SPD explains this provision:

> Must I wait until age 65 to start my pension?
>
> > No.  If you have the proper service requirement for an early pension, you may start your pension at any time after age 55.  The effective date of your early pension is called your Early Pension Date.
>
> How do I satisfy the service requirements for an early pension?
>
> > To be eligible to receive an early pension, *you must have at least 25 years of pension service*.

(Both's Aff., Ex. E., at 18, ¶¶ 39–40 (emphasis added).)

The 1995 SPD thus clarifies that a participant must satisfy all four of the criteria that the Plan enumerates in order to establish entitlement to an Early Pension.  As to the age and service

---

Nothing in any of the Parties' submissions suggests that Plaintiff accumulated any past pension service relevant to her application for pension benefits under the Plan.

9

requirements for a Normal Pension, the Plan provides that "[a]fter 1992, the Normal Pension Age for a participant is the later of the participant's 65th birthday and the day that is the 5th anniversary of the participant's Commencement of Participation."  (Both's Aff., Ex. D, at 103, § 1.12.)  The 1995 SPD explains this provision as well, again in question-and-answer format:

> When may I start receiving my normal pension?
>
>> Once you are *at least* age 65 and withdraw from work in the retail food industry in the plan area, you may apply for a normal pension benefit *provided* that you have satisfied the service requirement for a normal pension.  The effective date of your normal pension is called your Normal Pension Date.
>
> How do I satisfy the service requirement for a normal pension?
>
>> You must be a plan participant for at least five consecutive years up until your 65th (or later) birthday to satisfy the service requirement after 1992 . . . .
>
> If I have not satisfied the service requirement at age 65, can I still qualify for a normal pension at a later age?
>
>> Yes.  When you satisfy the service requirement after age 65, you are then eligible to retire and receive a normal pension.

(Both's Aff., Ex. E, at 16, ¶¶ 35–37.)

Lastly, the Plan sets out the circumstances under which a participant may forfeit the Accrued Benefit and Vesting Service that she has accumulated if she leaves covered employment before vesting:

> If a participant incurs a Break Year, then the participant shall have incurred a Break in Service.  All of the participant's Accrued Benefit and Vesting Service earned before the end of such Plan Year shall be forfeited unless the participant is vested. If such forfeited Accrued Benefit is reinstated in accordance with [other] provisions of [the Plan], such Accrued Benefit shall then be classed as a "Frozen Accrued Benefit."

> An Accrued Benefit also becomes classed as a Frozen Accrued Benefit . . . if a participant does not work enough during a Plan Year that the participant's Employers are required to contribute at least one monthly payment to the Fund.

(Both's Aff., Ex. D, at 400, § 4.03.)

As relevant here, the Plan defines a "Break Year" as "a Plan Year after 1975 during which, while a participant in the Plan, the participant did not earn at least 500 hours of Vesting Service nor at least one-twelfth of a year of Pension Service." (*Id.* at 101, § 1.03.)  The 1995 SPD explains these provisions as follows:

> What happens if I incur a break in service when I am not vested?
>
>> If you are not vested, your participation in the plan will stop, you will forfeit your Pension Service and Vesting Service that was earned prior to the break and you will also lose your most recent date of participation . . . .

(Both's Aff., Ex. E, at 14, ¶ 31.)

The Plan also lays out the manner in which a participant may restore any Accrued Benefit and Vesting Service that she has forfeited by incurring a Break in Service:

> If a participant's Accrued Benefit and Vesting Service are forfeited . . . , such Accrued Benefit and Vesting Service shall be reinstated if the participant subsequently works in Covered Employment for a sufficient period of time that the participant's Employer is required to make at least one monthly contribution to the Plan or the participant earns at least 1000 hours of Vesting Service in a Plan Year and . . . [,] if the Break in Service occurs after 1986, the number of consecutive Break Years charged to the participant at the time of such subsequent work *equals or exceeds the greater of five and the number of years of Vesting Service earned by the participant immediately prior to the Break in Service.*

(*Id.* at Ex. D, at 401, § 4.06 (emphasis added).)

The 1995 SPD explains this framework as follows:

> Can any Pension Service that I lost because of a break in service ever be reinstated?
>
>> This is where your years of Vesting Service can play an important part . . . .

11

> If you break your service after 1984 when you are not vested, later return to employment under the plan, and earn at least one-twelfth of a year of Pension Service in a Plan Year or at least one year of Vesting Service in a Plan Year, your Pension Service and Vesting Service that you forfeited will be reinstated *if* the number of consecutive Break Years you incur *is less than five or is less than the number of years of Vesting Service that you had at the time of the break*.
>
> Remember, however, that, in either case, because you did incur a break in service, all of your Pension Service will be classed as interrupted Pension Service and your benefit associated with your Pension Service earned before the break will be "frozen" . . . .

(Both's Aff., Ex. E, at 14–15, ¶ 34 (second emphasis added).)

As the language from the Plan and the SPD emphasized above highlights, there is a notable tension between the two. On its face, the Plan provision governing how a participant may reinstate her forfeited Accrued Benefit and Vesting Service is nonsensical. By its plain terms, it would *bar* a participant from reinstating her forfeited service if the number of Break Years that she had incurred was *smaller* than the number of years of Vesting Service that she had earned, thus providing an incentive for the participant to remain out of work for a *longer* period of time. A simple example demonstrates this point. Say that a participant earned four years of Vesting Service, then incurred a single Break Year, then returned to covered employment. That participant would be barred from reinstating her Accrued Benefit and Vesting Service, because the number of Break Years that she had incurred, which number would be *one*, would not "equal or exceed" the greater of five and the number of years of Vesting Service that she had earned, which number would be *five*. But if the same participant earned four years of Vesting Service, then incurred five Break Years, instead of just one, and waited until after those five years had passed to return to covered employment, she would be in the clear, as the number of Break Years that she had incurred, which number would be *five*, would "equal or exceed" the greater of five

and the number of years of Vesting Service that she had earned, which number would again be *five*.

This literal reading of the Plan provision is directly at odds with the SPD that the Fund issued to explain it, which states that, if a participant breaks her service after 1984 when she is not vested, later returns to employment under the Plan, and earns at least one-twelfth of a year of Pension Service in a Plan Year or at least one year of Vesting Service in a Plan Year, the Pension Service and Vesting Service that she forfeited will be reinstated if the number of consecutive Break Years that she incurred was "less than five or is less than the number of years of Vesting Service that [she] had at the time of the break." (Both's Aff., Ex. E, at 14–15, ¶ 34.) To use the same example, under the SPD's explanation of the Plan provision, if a participant earned four years of Vesting Service, then incurred a single Break Year, then returned to covered employment, she would not be barred from reinstating her Accrued Benefit and Vesting Service, as the number of consecutive Break Years that she incurred, which number would be *one*, would be less than five or less than the number of years of Vesting Service that she had at the time of the break, which number would be *four*. A literal reading of the Plan provision is also at odds with the 1993 Plan provision that governs the reinstatement of forfeited Accrued Benefit and Vesting Service after 1975 but before 1986, which states that the number of consecutive Break Years charged to the participant at the time of her return to covered employment must be "equal to or less than the number of years of Vesting Service earned by the participant immediately prior to the Break in Service . . . ." (Both's Aff., Ex. D, at 401, § 406(A).)

At oral argument, Defendants recognized the oddity of the results that would flow from reading the Plan provision literally, and in a letter that they subsequently filed with the Court on January 15, 2014, they stated that the discrepancy between the 1993 Plan and the 1995 SPD is

attributable to a "scrivener error" in the former.  (*See* Dkt. No. 29.)  However, as the January 1, 1995 SPD states, "In the event there appears to be a conflict between the description of any plan provision in this booklet and its statement in the Plan Of Benefits, the language contained in the Plan Of Benefits . . . is the official and governing language."  (Both's Aff., Ex. E, at D.)  Thus, it is the Plan provision, and not the SPD's interpretation of that provision, that controls.[11]

To summarize the 1993 Plan provisions described above, a participant may vest in her benefits if she satisfies the age and service requirements for an Early Pension, which means that she has reached her 55th birthday and has at least 25 years of Pension Service; if she satisfies the age and service requirements for a Normal Pension, which means that she has reached her 65th birthday and has been a Plan participant for five consecutive years; has at least ten years of Vesting Service; or has at least ten years of Pension Service, including at least two years of Future Pension Service.  However, if a participant incurs a Break in Service before she is vested, then all of her Accrued Benefit and Vesting Service earned before the end of the Plan Year in which the break occurs will be forfeited.  But even if a participant forfeits the Accrued Benefit and Vesting Service due to a Break in Service, the participant can still reinstate such Accrued Benefit and Vesting Service.  However, to do so, the participant must return to employment covered by the Plan for at least one-twelfth of a year of Pension Service or at least one year of Vesting Service.  And, because of the above-described "scrivener's error" in the 1993 Plan, the

---

[11] In their January 15, 2014 letter, Defendants raise several arguments as to why the Court should not apply the allegedly erroneous Plan provision in this Action, including that "Plaintiff cannot claim to have been misled by the error in the 1993 Plan, or [to] have suffered 'actual harm' as a result of the discrepancy . . . ."  (*See* Dkt. No. 29.)  However, as the Court will explain below, applying the Plan provision as it actually reads, as opposed to applying the Plan provision as it seems likely to have been intended to read, does not impact the Court's resolution of Defendants' Motion.  Accordingly, the Court does not reach the arguments that Defendants raise.

number of consecutive Break Years charged to the participant at the time of her return must equal or exceed the greater of five and the number of years of Vesting Service that she had accumulated at the time her Break in Service began.

### 4.  The 1998 Amendment to the Plan's Terms

On or about September 24, 1998, approximately 20 months after Plaintiff's termination, "the Plan was amended, effective January 1, 1999, to provide for five-year vesting instead of ten-year vesting" for any participant who earned at least one hour of Pension Service on or after the date on which the amendment entered into effect.  (Defs.' 56.1 Statement ¶ 10.)  According to the amended version of the Plan, a participant shall be considered vested at the earliest date after 1975 on which the participant satisfies the age and service requirements for an Early or Normal Pension, attains Normal Pension Age, has at least ten years of Vesting Service (five years of Vesting Service if the participant is not represented by a collective bargaining representative and the date of determination is after 1988), has at least ten years of Pension Service (including at least two years of Future Pension Service)—all ways in which a participant could have vested under the 1993 Plan—"or . . . has at least five years of Vesting Service *and has at least one hour of Vesting Service earned after 1998.*"  (Both's Aff., Ex. F, at 400, § 4.02 (emphasis added).)  A September 1998 Local 1500 newspaper article notifying members of this amendment explained that "[t]he necessary period of vesting service to achieve benefits for normal retirement benefits has been reduced from ten years to five years effective January 1, 1999 *for members who are actively employed after that date.*"  (Both's Aff., Ex. G. (emphasis added).)  The article also cautioned "that in order to be eligible for these new pension benefits, a member must be actively at work (*physically on the job*) after January 1, 1999 for the vesting

increase . . . ."  (*Id.*)  Local 1500 reiterated substantially the same information in a February 2000 newspaper article, and again in a January 1, 2001 SPD.[12]

### 5.  Plaintiff's Application for Pension Benefits

At some point after Plaintiff's employment with First National, Temp Force, Waldbaum's, and A&P, Plaintiff applied to receive a pension from the Fund.  (Defs.' 56.1 Statement ¶ 14.)  In a November 30, 2009 letter, a representative from the Fund's Pension Department informed Plaintiff that her application had been denied.  (Both's Aff., Ex. J.)  Upon checking the Fund's records, the representative had found that Plaintiff "had part time service from May 1989 to August 1995," and "then had full time pension service from September 1995 to January 1997," for a total of "seven years and nine months credited pension service."  (*Id.*)  However, "the vesting in 1997 was ten years, which [Plaintiff] did not have."  (*Id.*)  The Fund elaborated on the reasons for which Plaintiff's application had been denied in a March 24, 2010 letter from Judith P. Broach ("Broach"), one of the Fund's lawyers.  (Both's Aff., Ex. K.)  Broach first repeated the Pension Department representative's calculations, again informing Plaintiff that the Fund's records showed that she had earned "a total of seven years and nine months of Pension Service under the Fund's Plan."  (*Id.*)  Broach then explained why this Pension Service did not qualify Plaintiff for pension benefits:

---

[12] The February 2000 article stated that "any increase was only for members *actively at work (physically on the job) after January 1, 1999* for both the vesting increase and the benefit increase," and that "[u]nder the new benefits effective September 1, 1998, the necessary period of vesting service to achieve benefits for normal retirement benefits was reduced from ten years to five years effective January 1, 1999 *for members who are actively employed after that date.*"  (Both's Aff., Ex. H (emphasis added).)  In the "Plan Highlights" section of the January 1, 2001 SPD, it stated that in order to become eligible for the Plan, a participant needed "five years of Vesting Service (*provided* [*that the participant*] *ha*[*d*] *earned at least one hour of Vesting Service after 1998*) or ten years of Pension Service or ten years of Vesting Service or [to be] eligible for an Early or Normal Pension."  (Both's Aff., Ex. I, at A (emphasis added).)

16

You last earned Pension Service under the Plan in January of 1997.  At that time, the Plan provided that a Participant vested in his or her pension benefit after he/she earned 10 years of Pension or Vesting Service.  The Plan was amended to provide for five-year vesting, effective January 1, 1999, for any Participant who earned at least one hour of Vesting Service on or after that date.  Since you left the Plan in January of 1997, you did not meet this requirement.  Accordingly, you were not vested at the time you left the Plan.

When a Plan Participant who is not vested incurs a break in service, he or she forfeits all of his/her Pension Service.  At the time you ceased to participate in the Plan, in 1997, the Plan provided that you would incur a break in service if you were credited with less than one-twelfth of a year of Pension Service and less than five hundred hours of Vesting Service in a Plan Year.  In 1997, you received one-twelfth of a year of Pension Service, but did not earn five hundred hours of Vesting Service.  Accordingly, you sustained a break in service in 1997 and forfeited all of your Pension Service.

Under the terms of the Plan in effect at the time you ceased to be a Participant, your Pension Service could have been reinstated if you earned at least one-twelfth of a year of Pension Service in a Plan Year before the number of consecutive one-year breaks in service you incurred equaled the number of years of Vesting Service you had earned prior to the initial break in service.  In your case, you would have had your seven years and nine months of Pension Service reinstated if you had earned at least one-twelfth of a year of Pension Service in or before the end of 2003.  Of course, you did not earn such Pension Service.

Under the Plan in effect at the time you ceased to be a Participant, you also would have vested in a pension if you were age 65 or older at the time you completed five years of pension Service.  Since you were not age 65 at the time you last earned Pension Service, however, this provision is not applicable to you.

For all of the foregoing reasons, you are not eligible for any pension benefit from the Plan.

(*Id.*)

Plaintiff appealed the Fund's decision to the Board on or about April 28, 2010, and the Board heard her appeal on June 8, 2010.  (Defs.' 56.1 Statement ¶ 15.)  On or about June 24, 2010, Broach informed Plaintiff that the Board had upheld the Fund's original determination that she was not entitled to pension benefits, for reasons that for the most part tracked those that Broach outlined in her first letter.  (Both's Aff., Ex. L.)  After restating those reasons, Broach

17

then explained why several arguments that Plaintiff had made on appeal had not convinced the

Board to reverse the Fund's initial decision:

> The fact that the Plan was subsequently amended, effective January 1, 1999, to provide for five-year vesting does not change the above analysis.  Nothing in law or the Plan Document restores to a Participant any Pension Service which was permanently forfeited before the date a Plan amendment takes effect.
>
> Your appeal relied, in part, on a Plan provision which states that a Plan Participant will be vested in a pension on or after age 65 if he has earned five years of Pension Service.  This rule is applicable, however, only to Participants who have not forfeited all of their Pension Service before the age of 65.  This rule does not restore Pension Service permanently lost before attaining that age.
>
> You also argued that your service under . . . [the] Local 338 Pension Plan should be counted toward your Credited Service under the . . . Local 1500 Pension Plan.  The Local 338 Pension Plan is, however, a completely separate legal entity from . . . [the] Local 1500 Pension Plan and the two Plans do not have a reciprocity agreement.
>
> Pursuant to [ERISA], the Trustees are required to administer the Plan in accordance with Plan documents.  Under the Plan Document in effect when you incurred a permanent Break in Service in 1997, you do not meet the requirements for a pension.  As a consequence, the Trustees had no choice but to deny your appeal.

(*Id.*)

### B.  Procedural Background

Plaintiff filed her Complaint on June 18, 2012.  (*See* Dkt. No. 1.)  Defendants answered

on October 2, 2012.  (*See* Dkt. No. 2.)  At the initial conference on November 7, 2012, the Court

instructed Defendants to provide Plaintiff with "any plan information available between 1989

and 1997." (*See* Dkt. No. 5.)  Following a pre-motion conference that the Court held on April

17, 2013, during which conference the Parties discussed Defendants' contemplated Motion for

Summary Judgment, the Court issued a Scheduling Order in relation to such Motion.  (*See* Dkt.

No. 13.)  On June 17, 2013, Defendants' filed their Motion, (*see* Dkt. Nos. 14–19), to which

Plaintiff responded by way of Opposition Affirmation on July 17, 2013, (*see* Dkt. No. 20).

Defendants filed a Reply Affidavit on July 31, 2013, (*see* Dkt. No. 21), at which point Defendants' Motion was fully submitted.  The Court heard oral argument on Defendants' Motion on January 9, 2014.  (*See* Dkt. No. 24.)

## II.  Discussion

### A.  Standard of Review

Before the Court is Defendants' Motion for Summary Judgment.  Summary judgment shall be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dall. Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.,* 458 F.3d 80, 85 (2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.,* 432 F.3d 428, 433 (2d Cir. 2005).

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)

(footnote omitted); *see also Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) ("To survive a motion under Rule 56(c), [plaintiff] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial." (internal quotation marks and emphasis omitted)).  A fact is material when "it might affect the outcome of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *See Brod v. Omya, Inc.,* 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).  Thus, a court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex,* 477 U.S. at 323–24.

Finally, because Plaintiff is proceeding pro se, in deciding Defendants' Motion, "the Court must construe [Plaintiff's] pleadings liberally and interpret them to raise the strongest arguments that they suggest."  *Bell v. Jendell*, No. 12-CV-6666, 2013 WL 5863561, at *2 (S.D.N.Y. Oct. 31, 2013) (internal quotation marks omitted); *see also Triestman v. Fed. Bureau of* Prisons, 470 F.3d 471, 474–75 (2d Cir. 2006) (same); *Maisonet v. Metro. Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009) (same).

B.  Construing Plaintiff's Complaint

Plaintiff identifies the federal statutory right on which her Complaint is predicated as "ERISA . . . Section 502."  (Compl. 2.)  In connection with this identification, she also writes, "1. Pension plan documents, pension application (SPD)[;] 2. Penalty $110 . . . a day until I receive documents."  (*Id.*)  In describing the facts underlying her Complaint, she recounts the information contained in her Rule 56.1 Statement, related to her employment, termination, and application for pension benefits; claims that she "was vested under collective bargain [sic]

agreement which was terminated on June 18, 1994"; and writes that "[o]n February 24, 2012,

[she] asked for SPD of 1/1/1989 [and] [illegible] 1992 and Pension Application."  (*Id.* at 3.)

Plaintiff describes the relief she requests as follows:

> 1. Summary Pension Plan Description of 1/1/1989 which Plan was maintained in accordance with Collective Bargaining Agreement effective June 19, 1988, [e]xpiration date June 14, 1991.

> 2. Summary Pension Plan Description of 1/1/1992 which Plan was maintained in accordance with Collective Bargaining Agreement effective date June 16, 1991, [e]xpiration Date June 18, 1994.

> 3. [P]enalty up to $110 a day until I receive the materials.  On Feb. 24, 2012 I ask[ed] for documents from Mr. Both, Plan Man[ager] as I wrote in my letter of February 24, 2012.

> 4. I ask the Trustees to send me Application for my pension as I wrote in my letter of February 24, 2012.

(*Id.* at 4.)

Based on the foregoing, the Court agrees with Defendants that based solely on the

information contained in Plaintiff's Complaint itself, Plaintiff's Complaint is best construed as

asserting a cause of action against Defendants under Section 502(c) of ERISA, which describes

various forms of relief which may be sought, including fines of $100 per day, against

administrators of plans governed by ERISA who fail to comply with other provisions of the

section governing the types of information that such administrators are obligated to supply on

request.  *See* 29 U.S.C. § 1132(c) ("Administrator's refusal to supply requested information;

penalty for failure to provide annual report in complete form").  But statements contained in

Plaintiff's Opposition suggest that her Complaint is susceptible to being construed as also

challenging the Fund's decision to deny her application for pension benefits, as well as claiming

that the Fund violated Section 104(b) of ERISA, 29 U.S.C. § 1024(b), by failing to provide her

with legally required notice of the January 1, 1999 amendment to the plan described above.  For

example, Plaintiff writes that the Board "abused [its] discretion" in denying her application,

(Pl.'s 56.1 Statement ¶ 13), and that "[s]ince January 31, 1997 to October 2009[,] [she] did not

receive [the] Union Newspaper or [l]egally required notification of changes to the Fund's

terms," which means that "[t]he Fund did not compl[y] with ERISA 104(b) (29 USC 1024(b)

and 29 CFR 2520.104b-3[)], by distributing [s]ummaries of [m]aterial modification[s] within

210 days of the close of the plan year in which modification was adopted—1999 . . . . ," (Pl.'s

Aff. ¶ 17).

  Defendants encourage the Court not to construe Plaintiff's Complaint so liberally, and to

constrain its analysis to those of Plaintiff's claims that arise under ERISA Section 502(c).  (*See*

Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") 1–2.)  However, in

order to address the arguments that Defendants raise in response to Plaintiff's Section 502(c)

claims, the Court must necessarily, if indirectly, also address Plaintiff's putative claim that the

Board erred in denying her pension benefits application.  Defendants claim that Plaintiff's

Section 502(c) "cause of action should be dismissed as a matter of law because . . . Plaintiff

lacks standing under ERISA § 502 because she is not a 'participant or beneficiary' of the Fund,

as required by ERISA § 502(a)(1)(A) (29 U.S.C. § 1132(a)(1)(A)) . . . ."  (Defs.' Mem. 1.)  But,

as the Court will describe in greater detail below, if the Board abused its discretion in denying

Plaintiff's application because Plaintiff was entitled to the benefits that she sought, then Plaintiff

would in fact be a Plan "participant," thus defeating Defendants' standing argument.  For this

reason, and in consideration of the Second Circuit's clear direction that district courts construe

the pleadings of pro se parties like Plaintiff liberally and to raise the strongest arguments that

they suggest, the Court will address all three claims that Plaintiff's Complaint can be fairly

22

understood to raise.  The Court begins and ends its analysis of these arguments with Defendants'

argument that Plaintiff lacks standing to assert them.

### C.  Plaintiff's Standing Under ERISA Sections 502(c) and 104(b)

#### 1.  ERISA's Requirements

ERISA Section 502(a) states that "[a] civil action may be brought . . . *by a participant or*

*beneficiary* . . . for the relief provided for in subsection (c) of this section," "to recover benefits

due . . . under the terms of [a] plan, to enforce . . . rights under the terms of [a] plan, or to

clarify . . . rights to future benefits under the terms of [a] plan . . . ."  29 U.S.C. § 1132(a)

(emphasis added).  This Section also provides that a civil action may be brought "*by a*

*participant, beneficiary, or fiduciary* (A) to enjoin any act or practice which violates any

provisions of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable

relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the

terms of the plan . . . ."  *Id.*[13]

"The Supreme Court and Second Circuit have both explicitly found that § 502(a) is to be

narrowly construed to permit only the enumerated parties to sue directly for relief."  *Montefiore*

---

[13] ERISA defines a "fiduciary" as follows:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Based on the Parties' submissions, Plaintiff is indisputably not a fiduciary, nor does she claim to be one.

*Med. Ctr. v. Teamsters Local 272*, No. 09-CV-3096, 2009 WL 3787209, at *5 (S.D.N.Y. Nov.

12, 2009) (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463

U.S.1, 27 (1983); *Chemung Canal Trust Co. v. Sovran Bank/Md.*, 939 F.2d 12, 14 (2d Cir.

1991)), *aff'd*, 642 F.3d 321 (2d Cir. 2011); *see also Nechis v. Oxford Health Plans, Inc.*, 421

F.3d 96, 100–01 (2d Cir. 2005) ("The Supreme Court has construed § 502 narrowly to allow

only the stated categories of parties to sue for relief directly under ERISA."); *Connecticut v.*

*Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 112 (2d Cir. 2002) ("Because Congress

'carefully drafted' § 1132, parties other than those explicitly named therein—plan participants,

beneficiaries, and fiduciaries—may not bring suit.").

ERISA defines a "participant" as follows:

> [A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).

The Supreme Court has interpreted this language as follows:

> In our view, the term 'participant' is naturally read to mean either employees in, or reasonably expected to be in, currently covered employment, or former employees who have a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits. In order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future. This view attributes conventional meanings to the statutory language since all employees in covered employment and former employees with a colorable claim to vested benefits 'may become eligible.' A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the phrase 'may become eligible.'

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 117–18 (1989) (citations, internal quotation marks, and alterations omitted); *see also L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 65 (2d Cir. 2013) (same); *Peterson v. Windham Cmty. Mem'l Hosp., Inc.*, 803 F. Supp. 2d 96, 108 (D. Conn. 2011) (same).

Applying this standard, courts within the Second Circuit have held that, "[i]f [a plaintiff] fall[s] into the category of former employees, [she] must have either: (a) a reasonable expectation of returning to covered employment, or (b) a colorable claim to vested benefits." *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, No. 00-CV-7394, 2010 WL 8816299, at *10 (E.D.N.Y. May 28, 2010) (internal quotation marks omitted), *aff'd*, 710 F.3d 57 (2d Cir. 2013); *see also Caltagirone v. N.Y. Cmty. Bancorp.*, 414 F. Supp. 2d 188, 192 (E.D.N.Y. 2006) (same), *aff'd*, 257 F. App'x 470 (2d Cir. 2007).

In regard to the first of these two prongs, few courts within the Second Circuit have discussed the meaning of the phrase "reasonable expectation of returning to covered employment" in depth.  However, there does not appear to be any dispute that, in order to establish standing on the basis of this prong, a former employee must at the very least allege that she has a reasonable expectation of returning to covered employment.  *See Scanlan v. Kodak Ret. Income Plan*, 678 F. Supp. 2d 110, 115 (W.D.N.Y. 2010) (finding that a former employee lacked standing under ERISA based on the "reasonable expectation" prong because he "[did] not expect to return to employment"); *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 271 (S.D.N.Y. 2007) (declining to consider whether former employees had standing under ERISA based on the "reasonable expectation" prong where the plaintiffs did not "contend that they [would] ever return to covered employment"); *Fenwick v. Merrill Lynch & Co.*, No. 06-CV-880, 2007 WL 703613, at *3 (D. Conn. Mar. 5, 2007) ("With neither a colorable claim to vested

benefits nor an allegation of a reasonable expectation of returning to covered employment, plaintiffs lack standing . . . ."); *Caltagirone v. N.Y. Cmty. Bancorp*, 457 F. Supp. 2d 145, 148 (E.D.N.Y. 2006) ("There is no question that [the plaintiff] has no expectation of returning to covered employment.  The question is, then, whether [the plaintiff] has a colorable claim to vested benefits."), *aff'd*, 257 F. App'x 470 (2d Cir. 2007); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 71 (S.D.N.Y. 2006) (declining to consider whether former employees had standing under ERISA based on the "reasonable expectation" prong where the "[p]laintiffs admit[ted] that they [had] no reasonable expectation of returning to [the defendant] as employees.").

Courts have also held that a former employee does not have a reasonable expectation of returning to covered employment where she has resigned, *see Peterson*, 803 F. Supp. 2d at 108 (finding that a former employee could not demonstrate that he had a reasonable expectation of returning to covered employment on the date that he claimed to have requested Plan documents, as he had resigned from such employment approximately ten months earlier), particularly where the former employee's resignation was contentious, *see Albers v. Mellegard, Inc.*, No. 06-CV-4242, 2008 WL 7122683, at *13 (D.S.D. Oct. 27, 2008) ("Given the heated discussions that led to plaintiffs' voluntary termination of employment and the allegations in the present lawsuit, plaintiffs do not have a reasonable expectation of returning to employment . . . ."); where she has been terminated, *see Eide v. Grey Fox Technical Servs. Corp.*, 329 F.3d 600, 607 (8th Cir. 2003) (finding that former employees did not have a reasonable expectation of returning to covered employment after they were terminated, as they did not "have the option or expectation of returning to work"); *Davis v. Featherstone*, 97 F.3d 734, 737 (4th Cir. 1996) (finding that a former employee did not have a reasonable expectation of returning to covered employment, based on the defendant's "assert[ion], without rebuttal by [the former employee], that [the

26

former employee's] termination preclude[d] his return to the company"); *Curtis v. Nev. Bonding Corp.*, 53 F.3d 1023, 1027 (9th Cir. 1995) ("[The plaintiff] has no reasonable expectation of returning to covered employment in light of defendants' termination of his employment."), *overruled on other grounds by Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969 (9th Cir. 2012); *Taylor-Sammons v. Bath*, 398 F. Supp. 2d 868, 877 (S.D. Ohio 2005) ("Since plaintiff's employment was terminated, she has no reasonable expectation of returning to covered employment."); *Morris v. Winnebago Indus., Inc.*, 936 F. Supp. 1509, 1531 (N.D. Iowa 1996) (suggesting that, if the plaintiff failed to demonstrate that he was wrongfully terminated in violation of ERISA's anti-interference provision, his termination would establish that he did not have a reasonable expectation of returning to covered employment); *In re U.S. Airways, Inc.*, No. 04-CV-13819, 2007 WL 2416536, at *3 (Bankr. E.D. Va. Aug. 20, 2007) ("Because [the plaintiff] has no reasonable expectation of returning to covered employment with [the defendant] due to her termination by [the defendant], she must, as a former employee, demonstrate that she has a colorable claim to vested benefits." (internal quotation marks omitted)); or where she is not actively seeking reinstatement, *see Jiannetto v. Wash. Mut. Bank*, No. 04-CV-4205, 2007 WL 952062, at *5 (E.D.N.Y. Mar. 28, 2007) ("[P]laintiff . . . cannot establish that he has a reasonable expectation of returning to covered employment . . . .  As defendant points out, plaintiff does not seek reinstatement of employment as relief in this action."); *Dickerson v. Feldman*, 426 F. Supp. 2d 130, 136 (S.D.N.Y. 2006) ("Where, as here, Plaintiff has made no specific request to be reinstated to covered employment . . . , Plaintiff's return to employment . . . is speculative rather than likely.").

The Second Circuit has also suggested that a former employee does not have a reasonable expectation of returning to covered employment where "many years" have passed since she left

27

such employment.  *See Saladino v. I.L.G.W.U. Nat'l Ret. Fund.*, 754 F.2d 473, 476 (2d Cir. 1985) (noting, in a case where a former employee first brought ERISA claims against his former employer 17 years after he had last been employed by that employer, that "[e]xpansion of [the definition of "participants"] to former employees of many years past or others with no colorable claim to benefits would create uncertainties as to statutory obligations and impose great costs on pension plans for no legislative purpose."); *see also Olson v. Chem-Trend Inc.*, No. 94-CV-75201, 1995 WL 866221, at *3 (E.D. Mich. May 30, 1995) ("Because [the plaintiff's] employment was terminated by [the defendant] seven years ago, it seems unlikely that he has a reasonable expectation of returning to covered employment." (internal quotation marks omitted)).

In regard to the second prong, under which a former employee can establish standing under ERISA if she has "a colorable claim to vested benefits," the Court acknowledges that "[t]he requirement of a colorable claim is not a stringent one."  *Moriarity v. United Techs. Corp. Represented Employees Ret. Plan*, 947 F. Supp. 43, 49 (D. Conn. 1996) (citation and internal quotation marks omitted), *aff'd*, 158 F.3d 157 (2d Cir. 1998); *see also Roarty v. AFA Protective Sys., Inc.*, No. 06-CV-152, 2006 WL 3370349, at *3 (E.D.N.Y. Nov. 20, 2006) ("A colorable claim is one that is arguable . . . ." (internal quotation marks omitted)).  However, a former employee's claim to vested benefits is not colorable where it is not "rooted in existing law," *Moriarity*, 947 F. Supp. at 49; where it is "frivolous," *Roarty*, 2006 WL 3370349, at *3; or where the employee "fail[s] to point to any written language from [her former employer] that could reasonably be interpreted as a promise to vest [her] . . . benefits," *Peterson*, 803 F. Supp. 2d at 108.

As for "beneficiary," ERISA defines that term to mean "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder."  29 U.S.C. § 1002(8).  While "[i]t is true that the statute refers to a person 'who is *or may be* entitled to a benefit' under the plan," that language "merely reflects the fact that some designees are, under the terms of the plan in question, immediately entitled to a benefit while others, though designated by the participant, only stand to become entitled to a benefit upon some contingency such as the participant's death."  *Park v. Trs. of 1199 SEIU Health Care Emps. Pension Fund*, 418 F. Supp. 2d 343, 350 (S.D.N.Y. 2005).  "The definition is [still] limited to persons designated by the participant, or by the terms of the plan."  *Id.* (alterations and internal quotation marks omitted).  "[T]he threshold requirement of having been designated by [a] participant (or by the terms of the plan) [must still] be satisfied."  *Id.*

### 2.  Plaintiff Is Not a "Participant" Under ERISA

The last time that Plaintiff was employed by an employer contributing to the Plan was in January 1997, when she was terminated.  (*See* Pl.'s 56.1 Statement ¶ 3; Pl.'s Aff. ¶ 5; Dkt. No. 25.)  Thus, from that date to the present, Plaintiff has been a "former employee" of the contributing employers.  Therefore, in order to be a "participant" under ERISA, Plaintiff must have (1) "a reasonable expectation of returning to covered employment"; or (2) "a colorable claim to vested benefits."  *Firestone*, 489 U.S. at 117 (internal quotation marks and alterations omitted); *see also id.* at 118 ("A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits . . . simply does not fit within the phrase 'may become eligible.'" (internal quotation marks and alterations omitted)); *L.I. Head Start*, 2010 WL 8816299, at *10 (same); *Caltagirone*, 414 F. Supp. 2d at 192 (same).

It is clear that Plaintiff cannot satisfy the first prong.  In the first instance, Plaintiff has not even alleged, much less provided any evidence, that she has any expectation of returning to covered employment at all.  *See In re J.P Morgan Chase Cash Balance Litig.*, 242 F.R.D. at 271; *Fenwick*, 2007 WL 703613, at *3.  Nor has Plaintiff alleged or provided any evidence that she is seeking reinstatement.  *See Jiannetto*, 2007 WL 952062, at *5; *Dickerson*, 426 F. Supp. 2d at 136.  Additionally, even if she had alleged that she has an expectation of returning to covered employment, the reasonableness of such an expectation would be undermined by the fact that Plaintiff was terminated, *see Bath*, 398 F. Supp. 2d at 877; *In re U.S. Airways, Inc.*, 2007 WL 2416536, at *3, and that more than 15 years passed between her termination and the filing of her Complaint, *see Saladino*, 754 F.2d at 476; *Olson*, 1995 WL 866221, at *3.  What is more, Plaintiff was not only terminated—she was terminated for cause.  As Defendants point out, "[g]iven that Plaintiff was terminated for cause, it is doubtful that she would [be] hired even if she [were to] appl[y] . . . ."  (Def.'s Mem. 14 n.3.)  *Cf. Albers*, 2008 WL 7122683, at *13 (noting the relevance of the contentious nature of a former employee's departure to the inquiry of whether such employee has a reasonable expectation of returning to covered employment).  Accordingly, the Court finds that Plaintiff does not have standing under the first prong.

It is the second prong that requires the Court to delve into the merits of the Board's denial of Plaintiff's pension benefits application.  After reviewing the relevant terms of the 1993 Plan, the SPDs explaining those terms, and the Board's determination, the Court concludes that Plaintiff does not have a colorable claim to vested benefits.  As described in detail above, under the 1993 Plan, which was in effect at the time that Plaintiff was terminated, Plaintiff could have vested in her pension benefits if (1) she had satisfied the age and service requirements for normal or early pension; (2) she had at least ten years of Pension Service (including at least two years of

Future Pension Service); or (3) she had at least ten years of Vesting Service (five years of Vesting Service if not represented by a collective bargaining representative and the date of determination is after 1988).  (*See* Both's Aff., Ex. D, at 400, § 402; *id.*, Ex. E, at 12, ¶ 28.)

Beginning with the second of these avenues to vesting, at no point did Plaintiff ever accumulate ten years of Pension Service.  The 1993 Plan defines Pension Service as "Past Pension Service" and "Future Pension Service."  (*Id.*, Ex. D., at 103, § 1.13.)  As there is no reason to believe that Plaintiff ever accumulated "Past Pension Service," *see supra* note 10, to establish that she accumulated ten years of Pension Service, Plaintiff must rely on her "Future Pension Service," which the 1993 Plan defines as "employment by an Employee with an Employer in a position for which the Employer is required to contribute to the Fund in accordance with a collective bargaining agreement with the Union or an agreement between such Employer and the Trustees."  (*Id.*, Ex. D., at 103, § 1.13B.)

Defendants note that Plaintiff was employed in such a position with First National for approximately seven years and nine months before she was terminated, (*see* Defs.' 56.1 Statement ¶ 3), which would leave Plaintiff approximately two years and three months short.  In response, Plaintiff first attempts to argue that she "had 10 years of . . . service under [the] UFCW Local 1500 Pension Plan[,] working for First National Supermarket and 14 weeks for Stop & Shop, as it is indicated in [her] Social Security covered FICA earning for 11 years."  (Pl.'s 56.1 Statement ¶ 6.)  But this argument is belied by Plaintiff's own submissions, in which she admits that her "participation in covered full time employment with First National Supermarket began on May 1, 1989," (*id.*), and that she was "fired" "[a]fter 8 years of full time employment with First National Supermarket, Inc." and her "[n]ew [e]mployer (for 14 week[s])[,] Stop &

Shop . . . [,] in January 1997," (*id.* ¶ 3; *see also* Pl.'s Aff. ¶ 5 ("In January 1997 I was

[f]ired . . . by Stop & Shop . . . .").)

Next, Plaintiff asserts that she "earned [a] [t]otal [of] 11 years covered [P]ension Service

with UFCW–United Food & Commercial Workers Pension Plan," by including in her Pension

Service calculations the time that she worked for A&P and Waldbaum's in 1998 and 1999.

(Pl.'s Aff. ¶¶ 11–15.)  But as noted above, Defendants note that A&P never contributed to the

Fund on behalf of its own employees, and that it made contributions on behalf of Waldbaum's

employees only to the Local 338 Pension Fund, a legal entity separate from the Local 1500

Fund, and with which the Local 1500 Fund did not have a reciprocity agreement.  (*See* Defs.'

56.1 Statement ¶ 4.)  Plaintiff has not challenged these statements, nor has she provided any

evidence to the contrary.[14]  As a result, the time Plaintiff spent working at A&P and Waldbaum's

cannot count towards her Future Pension Service, as A&P and Waldbaum's were not employers

"required to contribute to the Fund in accordance with a collective bargaining agreement with

the Union or an agreement between such Employer and the Trustees."  (Both's Aff., Ex. D at

---

[14] While Plaintiff does claim that "UFCW, Local 1500, is [the] exclusive representative of employee's [sic] of the Employer with respect of [the] employer's payment for contributions to the Pension Fund, Welfare Fund and Legal Service Fund, according to the provisions of [the] Bargaining Agreement," (Pl.'s Aff. ¶ 15), and that "Local 1500 is [the] exclusive representative of employees of the Employer for the Purpose of collective bargaining with respect to rates of pay, wages, hours of Employment, and other condition of employment, according to the National Labor Relations Act and ERISA of 1974, as amended IRC 1986," (Pl.'s 56.1 Statement ¶ 11), it is unclear to which employer or employers Plaintiff is referring.  If Plaintiff is referring to First National, Edwards, and Stop & Shop, the Parties do not appear to be in disagreement. But if Plaintiff is referring to A&P and Waldbaum's, then Plaintiff's statements could perhaps be taken as implicit disagreement with Defendants' statement that A&P contributes not to Local 1500's but to Local 338's pension fund.  Nevertheless, Plaintiff has not provided the Court with any evidence that A&P or Waldbaum's contributed to the Fund while she was employed by either company.  In fact, as noted above, Plaintiff's own submissions prove the opposite.  *See supra* note 7.

103, § 1.13B.)  As such, Plaintiff cannot establish that she accumulated ten years of Pension

Service.

      In regard to the third avenue to vesting, Plaintiff cannot show that she earned ten years of

Vesting Service.  The 1993 Plan defines Vesting Service as including both "Pension Service,"

described above, as well as "Related Employment."  (*Id.* at 105, § 1.21.)  The 1993 Plan defines

"Related Employment" as "employment, after 1975, *with a contributing Employer* for which

employment such Employer is not required by agreement with the Union or with the Trustees to

contribute to the Fund, provided such employment is not separated from Covered Employment

with the same Employer, by a quit, discharge, or retirement."  (*Id.* at 104, § 1.17 (emphasis

added).)  As noted previously, Plaintiff earned only seven years and nine months of Pension

Service.  The time that she worked for A&P and Waldbaum's does not count as "Related

Employment," and therefore cannot close the gap between Plaintiff's seven years and nine

months and the required ten years, as neither of those two entities were "contributing

Employers."  The 1993 Plan defines "Employer" as "any Employer who is required to pay

contributions to the Fund for the purposes of the Plan as the result of an agreement between such

Employer and the Union, or between such Employer and the Trustees"—a description that A&P

and Waldbaum's do not match—or "the Union and any of the benefit funds affiliated with the

Union provided, in both cases, such Employer agrees to contributing to the Fund on the same

basis as other Employers"—a description that A&P and Waldbaum's also do not match.  (*See id.*

at 103, § 1.08.)  Thus, Plaintiff cannot establish that she accumulated ten years of Vesting

Service.

      Plaintiff also did not meet the age and service requirements for an Early or Normal

Pension.  The 1993 Plan states that the Early Pension Date for a participant shall be the first day

of the month coinciding with or next following the latest of the participant's 55th birthday; the participant's completion of at least 25 years of Pension Service (including at least two years of Future Pension Service); the date of the participant's proper application for pension to the Trustees; and the participant's cessation of work at employment that would earn Pension or Vesting Service under the Plan.  (*Id.* at 500, § 5.02.)  In explaining these requirements, the 1995 SPD makes clear that all four must be satisfied, and specifically states that, "[t]o be eligible to receive an early pension, [*a participant*] *must have at least 25 years of pension service*."  (Both's Aff., Ex. E, at 18, ¶ 40 (emphasis added).)  Plaintiff did not accumulate ten, much less 25, such years.

In regard to the age and service requirements for a Normal Pension, the 1993 Plan provides that "[a]fter 1992, the Normal Pension Age for a participant is the later of the participant's 65th birthday and the day that is the 5th anniversary of the participant's Commencement of Participation."  (*Id.*, Ex. D, at 103, § 1.12.)  The 1995 SPD explains that once a participant is "*at least* age 65," she "may apply for a normal pension benefit *provided* that [she has] satisfied the service requirement for a normal pension," which service requirement is that she "be a plan participant for at least five consecutive years up until [her] 65th (or later) birthday . . . ."  (*Id.*, Ex. E, at 16, ¶¶ 35–36.)  During her time at First National, Plaintiff was a plan participant for five consecutive years, and as a result, had she continued working in covered employment, she would have vested in her pension benefits when she turned 65 in 2002.  But Plaintiff's termination in 1997 caused her to incur a Break in Service, as nothing in the record suggests that Plaintiff earned at least 500 hours of Vesting Service in that year or in any year subsequent.  (*See* Both's Aff., Ex. D at 101, § 1.03.)  As described above, Plaintiff's employment with A&P and Waldbaum's did not count as Pension Service or Related Employment, the two

34

categories of work that qualify as Vesting Service.  (*See id.* at 105, § 1.21.)  Therefore, Plaintiff "forfeited" "[a]ll of [her] Accrued Benefit and Vesting Service earned before the end of [the 1997] Plan Year . . . ." (*Id.* at 400, § 4.03)  She did not restore this Accrued Benefit and Vesting Service before she turned 65, or at any point thereafter, as she never "subsequently work[ed] in Covered Employment for a sufficient period of time that [her] Employer [was] required to make at least one monthly contribution to the Plan," or "earn[ed] at least 1000 hours of Vesting Service in a Plan Year . . . ."  (*Id.* at 401, § 4.06.)  Thus, Plaintiff has not satisfied the age or service requirements for an Early or Normal Pension.[15]

For all of these reasons, the Court finds that Plaintiff does not have a colorable claim to vested benefits, nor did she have such a claim at any point before or after her termination.  The relevant terms from the 1993 Plan are sufficiently clear, and their clarity is heightened by the SPDs that the Fund issued to provide employees and former employees like Plaintiff with assistance in their interpretation.  When applied to the undisputed facts, those terms establish beyond a doubt that Plaintiff is not entitled to the pension benefits that she seeks.  Unsurprisingly, the Fund was consistent in finding the same on the three separate occasions that it considered Plaintiff's application.  Put simply, Plaintiff has "failed to point to any written

---

[15] In her Affirmation, Plaintiff also appears to argue that she was "grandfathered" into eligibility for a pension under an SPD issued on January 1, 2011, which explains the Plan's most current version.  (*See* Pl.'s Aff. ¶ 23.)  However, the provision to which she cites, Paragraph 44(B), relates to eligibility for an Early Pension—Paragraph 43 clearly states that, "[t]o be eligible to receive an Early Pension, you must have at least 25 years of pension service."  (Pl.'s Ex., January 1, 2011 SPD, at 18, ¶ 43.)  As noted throughout this Opinion, Plaintiff had only seven years and nine months of Pension Service at the time she was terminated, before such service was forfeited due to her Break in Service.

language from [Defendants] that could reasonably be interpreted as a promise to vest [her] . . .
benefits." *Peterson*, 803 F. Supp. 2d at 108.[16]

The non-retroactive 1998 amendment to the Plan does not change the Court's conclusion
that Plaintiff does not have a colorable claim to vested benefits.  That amendment replaced the
1993 Plan's ten-year vesting with five-year vesting, effective January 1, 1999, approximately
two years after Plaintiff was terminated.  (Defs.' 56.1 Statement ¶ 10.)  According to the
amendment, a participant can vest in her benefits if she "has at least five years of Vesting service
*and has at least one hour of Vesting Service earned after 1998*."  (Both's Aff., Ex. F, at 400, §
4.02 (emphasis added).)  A September 1998 Local 1500 newspaper article explained that "[t]he
necessary period of vesting service to achieve benefits for normal retirement benefits has been
reduced from ten years to five years effective January 1, 1999 *for members who are actively
employed after that date*," and cautioned "that in order to be eligible for these new pension
benefits, a member must be actively at work (*physically on the job*) after January 1, 1999 for the
vesting increase . . . ."  (Both's Aff., Ex. G. (emphasis added); *see also* Both's Aff., Ex. H;
Both's Aff., Ex. I, at A.)  Because A&P and Waldbaum's were not Contributing Employers,
Plaintiff's employment with those entities after 1998 does not qualify as the requisite Vesting
Service.

---

[16] One district court within the Second Circuit has observed that "the class of 'potential participants,' those who have 'colorable claims' to benefits, clearly encompasses a larger group than just those individuals ultimately determined to have rights under a plan," and that "[a] court may properly award statutory penalties under § 502(c) even if it determines that the plaintiff does not qualify for plan benefits."  *See Kascewicz v. Citibank, N.A.*, 837 F. Supp. 1312, 1321 (S.D.N.Y. 1993).  In contrast to the case in which that court so observed, this is a case in which the Fund "was []able [and] []willing to give [Plaintiff] a prompt, unequivocal response to [her] inquiry concerning [her] eligibility," and in which "language in the [Plan and SPDs and] uncontradicted extrinsic evidence unambiguously excluded [Plaintiff] from the Plan's coverage." *See id.*

In connection with the 1998 amendment, Plaintiff argues that the "Pension Reform Act of 1989" mandated the amendment's applicability to her application, or otherwise made her eligible for five-year instead of ten-year vesting during her employment, by amending ERISA Section 203(a)(2).  (*See* Pl.'s Aff. ¶ 3.)  This claim misses the mark, as the Pension Reform Act of 1989 never made it out of committee and was never enacted, despite multiple reintroductions.  *See* H.R. 3306, 101st Cong. (1989–90); H.R. 1735, 102d Cong. (1991–92); H.R. 2502, 103d Cong. (1993–94); H.R. 1048, 104th Cong. (1995–96).[17]  However, the Tax Reform Act of 1986 ("TRA"), Pub. L. No. 99-514, 100 Stat. 2085 (1986), a statute that *was* enacted, did amend ERISA Section 203(a), 29 U.S.C. § 1053(a)(2), in a number of ways, including by providing that most ERISA plans thereafter "satisfie[d] the requirements of [that] paragraph if . . . an employee who [had] completed at least 5 years of service [had] a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions," § 1113(e)(1), 100 Stat. at 2447.

Defendants acknowledge that the TRA "reduc[ed] from ten years to five years the minimum amount [of] service that participants in qualified plans [were required to] earn in order to become vested," and "set forth deadlines by which qualified plans were required to adopt five-year vesting."  (Def. Both's Reply Aff. in Supp. of Defs.' Mot. for Summ. J. ("Both's Reply Aff.") ¶ 7.)  However, Defendants argue that the Small Business Job Protection Act of 1996

---

[17] Plaintiff also makes reference to "H.R. 4367 Pension Reform Act 1983, 103d Congress."  (*See* Pl.'s Aff.)  The Court interprets this as a reference to the Pension Reform Act of 1993, H.R. 4367, 103d Cong. (1993–94).  But this bill also stalled in committee.  *See* H.R. 4367, 103d Cong. (1993–94); H.R. 1048, 104th Cong. (1995–96).  Plaintiff also referenced "the Pension Reform Act of 1994" at oral argument.  No such bill exists, but because the Pension Reform Act of 1993 was introduced in Congress on June 9, 1994, the Court interprets Plaintiff's reference to "the Pension Reform Act of 1994" to be another reference to the Pension Reform Act of 1993.  *See* H.R. 4367, 103d Cong. (1993–94).

("SBJPA"), Pub. L. No. 104-188, 110 Stat. 1755 (1996), "extended" "the deadline for multiemployer plans, such as the Fund's Plan, to adopt five-year vesting." (*Id.*) Defendants are not quite correct. The SBJPA did not extend the deadline by which multiemployer plans were required to adopt five-year vesting. Rather, the SBJPA imposed upon multiemployer plans a five-year vesting requirement for the first time, at least as to employees covered by CBAs. Although the TRA generally imposed a five-year vesting requirement on most ERISA plans, it specifically addressed the vesting requirements applicable to multiemployer plans in a separate subparagraph:

> A plan satisfies the requirements of this subparagraph if—
>
> > (i) the plan is a multiemployer plan . . . , and
> >
> > (ii) under the plan—
> >
> > > (I) an employee who is covered pursuant to a collective bargaining agreement . . . and who has completed at least 10 years of service has a nonforfeitable right to 100 percent of the employee's accrued benefit derived from employer contributions, and
> > >
> > > (II) the requirements of [the subparagraphs imposing five-year vesting on most ERISA plans] are met with respect to employees not described in subclause (I).

§ 1113(e)(1), 100 Stat. at 2447–48.[18]

---

[18] ERISA defines a "multiemployer plan" as "a plan—(i) to which more than one employer is required to contribute, (ii) which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer, and (iii) which satisfies such other requirements as the Secretary may prescribe by regulation." 29 U.S.C. § 1002(37)(A). Although the issue was not directly addressed in the Parties' submissions, it appears as though more than one employer is required to contribute to the Plan, (*see* Both's Aff. ¶ 2), and that the Plan is maintained pursuant to one or more CBAs between one or more employee organizations and more than one employer, (*see id.* ¶ 4). Plaintiff does not challenge Defendants' characterization of the Plan as a multiemployer plan for the purposes of the TRA and the SBJPA. (*See* Both's Reply Aff. ¶ 7.)

Thus, upon its enactment in 1986, the TRA imposed upon multiemployer plans a ten-year vesting requirement for employees covered by CBAs, but a five-year vesting requirement for employees not covered by CBAs.  However, upon its enactment in 1996, the SBJPA imposed upon multiemployer plans a five-year vesting requirement as to all employees, regardless of whether they were covered by CBAs, in a section titled, "Elimination of Special Vesting Rule for Multiemployer Plans," which struck the subparagraph that created a separate regime for multiemployer plans.  *See* § 1442(b), 110 Stat. at 1808.  The SBJPA provided the following as to when its elimination of the special vesting rule for multiemployer plans would take effect:

> The amendments made by this section shall apply to plan years beginning on or after the earlier of—
>
> (1) the later of—
>
>> (A) January 1, 1997, or
>>
>> (B) the date on which the last of the collective bargaining agreements pursuant to which the plan is maintained terminates (determined without regard to any extension thereof after the date of the enactment of this Act), or
>
> (2) January 1, 1999.
>
> *Such amendments shall not apply to any individual who does not have more than 1 hour of service under the plan on or after the [first] day of the [first] plan year to which such amendments apply.*

§ 1442(c), 110 Stat. at 1808 (emphasis added).

Upon the Court's request at oral argument, Defendants subsequently provided the Court with a letter in which they elaborated on how they brought the Plan into conformity with the SBJPA:

> [A collective bargaining agreement between Edwards] and Local 1500 U.F.C.W. . . . cover[ed] the period [from] June 19, 1994 to June 20, 1998.  That CBA

39

was in effect on August 20, 1996, the date that the Small Business Job Protection Act was enacted.

Because June 20, 1998, the termination date of the . . . CBA, is later than January 1, 1997 and earlier than January 1, 1999, the Fund was required to amend the Plan to make five-year vesting effective as of the first day of the Plan Year beginning on or after June 20, 1998. Pursuant to Rule 1.16 of the 1993 Plan, the Plan's Plan Year is January 1 to December 31. Thus, the first day of the Plan Year after June 20, 1998 was January 1, 1999.

Accordingly, on or about September 24, 1998, the Plan was amended, effective January 1, 1999, to provide for five-year vesting instead of ten-year vesting for any participant who earned at least one hour of Pension Service on or after January 1, 1999. Plaintiff did not earn any Pension Service on or after January 1, 1999, and is therefore not covered by the amendment.

(Dkt. No. 29 (citations omitted).)[19]

Thus, Defendants' actions in amending the Plan to provide for five-year vesting were compliant with both the TRA and the SBJPA. Further, neither the TRA, nor the SBJPA, nor the 1998 amendment itself caused Plaintiff's benefits to vest, as she never attained "more than [one] hour of service under the [P]lan on or after the [first] day of the [first] plan year to which [the 1998 amendment] appl[ied]," § 1442, 110 Stat. at 1808, which day was January 1, 1999, given that she was terminated from covered employment in 1997. Thus, nothing about the 1998 amendment changes the Court's determination that Plaintiff does not have a colorable claim to vested benefits.[20]

---

[19] Defendants attached the CBA in question to their letter. (*See* Dkt. No. 29.)

[20] Several courts have interpreted the second category of former employees that the *Firestone* court described as "participants" under ERISA—those who have "colorable claim[s] to vested benefits"—as including former employees who have either "colorable claims that they will prevail in suits for benefits," or "colorable claims that they will fulfill eligibility requirements in the future." *See, e.g.*, *Featherstone*, 97 F.3d at 734; *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1535 (10th Cir. 1993). This interpretation appears to be based on the *Firestone* court's statement that, "In order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Firestone*, 489 U.S. at

### 3.  Plaintiff Is Not a "Beneficiary" Under ERISA

In finding that Plaintiff is not a "beneficiary" under ERISA, the Court need only note that nothing in the record indicates that Plaintiff was designated as such by a participant, or by the terms of the Plan, as required by ERISA's definition of that term.  *See* 29 U.S.C. § 1002(8) (defining "beneficiary" to mean "a person designated by a participant, or by the terms of an employee benefit plan . . . ."); *see also Park*, 418 F. Supp. 2d at 350 ("The definition is limited to persons designated by the participant, or by the terms of the plan." (alternation and internal quotation marks omitted)).

### 4.  Plaintiff Lacks Standing Under ERISA Sections 502(c) and 104(b)

Because Plaintiff is neither a "participant" nor a "beneficiary" as ERISA defines those terms, Plaintiff lacks standing to assert causes of action against Defendants under ERISA Section 502(c),  29 U.S.C. § 1132(c), and ERISA Section 104(b), 29 U.S.C. § 1024(b).  *See*

---

117–18.  There appear to be only ten reported cases in which courts have taken this approach, all from the Fourth, Tenth, and Sixth Circuits, and none from the Second Circuit.

There are grounds to challenge this interpretation.  The question of whether a former employee has a "colorable claim that [she] will prevail in a suit for benefits" is identical to the question of whether that employee has a "colorable claim to vested benefits."  As for the question of whether a former employee has "a colorable claim that [she] will fulfill eligibility requirements in the future," such an inquiry is likely already covered by the first category of former employees that the *Firestone* court described as "participants" under ERISA—those who have a "reasonable expectation of returning to covered employment."

Regardless, even if the above-described cases are correct, in the case before the Court, the inquiries that they suggest collapse into those that the Court has already undertaken.  Plaintiff has no colorable claim that she will prevail in a suit for benefits, because, as noted previously, she has no colorable claim to vested benefits.  Additionally, Plaintiff has no colorable claim that she will fulfill eligibility requirements in the future, as to do so, she would need to vest in her pension benefits through one of the mechanisms provided by the current iteration of the Plan, any of which mechanisms would require Plaintiff to be rehired into covered employment.  But, as also noted previously, Plaintiff has not alleged, nor does she have, a reasonable expectation of returning to covered employment.

*Peterson*, 803 F. Supp. 2d at 108 (finding that a former employee lacked standing to assert a claim against the defendant under Section 502(c)(1) because the former employee did not have a "reasonable expectation of returning to covered employment" or a "colorable claim to vested benefits").  For the same reason, Plaintiff also lacks standing to challenge the Fund's decision to deny Plaintiff's application for pension benefits.  *See Giordano v. Thomson*, 564 F.3d 163, 168 (2d Cir. 2009) ("ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a person to whom benefits are owed under an ERISA plan may bring a civil action to recover them.  To prevail under § 502, a plaintiff must show that (1) the plan is covered by ERISA, (2) plaintiff is a participant or beneficiary of the plan, and (3) plaintiff was wrongfully denied severance pay owed under the plan."  (citations omitted)); *see also Guerrero v. FJC Sec. Servs. Inc.*, 423 F. App'x 14, 16 (2d Cir. 2011) (same); *cf. Physicians Health Servs.*, 287 F.3d at 122 (upholding district court's dismissal of plaintiff's suit for equitable relief under 29 U.S.C. § 1132(a)(3) for lack of standing where plaintiff was not a "participant," "beneficiary," or "fiduciary"); *Park*, 418 F. Supp. 2d at 352 (dismissing claims plaintiff asserted under 29 U.S.C. §§ 1132(a)(1), (a)(3), and (g)(1) because plaintiff was not a "participant," "beneficiary," or "fiduciary").[21]

---

[21] At oral argument, Plaintiff submitted to the Court a large volume of documents that she did not originally include in her written submissions, long past the deadline by which the Court had directed her to submit any documents that could bear on the resolution of Defendants' Motion.  (*See* Dkt. No. 13 (directing Plaintiff to "serve opposition papers upon Defendants by no later than July 31, 2013").)  The Court made photocopies of such documents available to Defendants.  Plaintiff has continued to submit similar documents to the Court since the conclusion of oral argument, without prior permission from the Court to do so.  (*See, e.g.*, Dkt. Nos. 26–28.)  While the Court would have been within the bounds of its discretion to refuse to consider the additional documents that Plaintiff has belatedly submitted, *see Watson v. Geithner*, 355 F. App'x 482, 483 (2d Cir. 2009) (finding that the district court did not abuse its discretion in refusing to consider a pro se plaintiff's untimely opposition to the defendants' summary judgment motion), it has nevertheless done so.  None of the information contained therein supports any of Plaintiff's arguments.

### III.  Conclusion

For the reasons given herein, Defendants' Motion for Summary Judgment is granted.

The Clerk is respectfully requested to terminate the pending Motion, (*see* Dkt. No. 14), to enter

judgment for Defendants, and to close this case.

SO ORDERED.

Dated:        March **31** , 2014
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

For example, apparently in support of her argument that the Court should include in its
calculation of her Pension Service the time that she worked for A&P and Waldbaum's in 1998
and 1999, Plaintiff submitted what seem to be sections of a July 2013 SPD issued by the UFCW
International Union to explain its Industry Pension Fund Future Service Pension Plan.  (*See* Dkt.
No. 27.)  Appendix B to the SPD contains a list of reciprocity agreements into which the
International Union's Industry Pension Fund has entered.  (*See id.*)  However, Defendants
describe the International Union's Industry Pension Fund as "a completely separate legal entity
than the Fund," any plans of which "do not govern the terms of the Fund's Plan," (*see* Dkt. No.
30), and Plaintiff has not provided any information to the contrary.  What is more, Appendix B
does not list Local 1500's Pension Fund nor Local 338's Pension Fund as entities with which the
International Union's Industry Pension Fund has entered into reciprocity agreements.  (*See* Dkt.
No. 27.)  Plaintiff's other submissions are similarly irrelevant or unhelpful.

43